IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

STEVE LANE,

    Plaintiff,

        v.

UNITED STATES OF AMERICA,
UNITED STATES DEPARTMENT OF
AGRICULTURE, and SONNY PERDUE,
in his Official Capacity as
Secretary of the United States
Department of Agriculture,

    Defendants.

CV 617-082

## O R D E R

Before the Court are Plaintiff and Defendant United States of America's (the "Government") cross motions for summary judgment. (Docs. 9, 15.) Plaintiff, a farmer from southeast Georgia, challenges a decision issued by an Administrative Law Judge ("ALJ") with the United States Department of Agriculture ("USDA"). The ALJ's decision found that Plaintiff made a false claim for crop insurance on his 2009 tobacco crop and that Plaintiff failed to properly report information as required by his crop insurance policy. The ALJ imposed an $11,000 fine and barred Plaintiff from participating in any federal aid program to farmers for five years. Plaintiff seeks judicial review from

this Court and argues that the decision was arbitrary and capricious.

## I. BACKGROUND

Plaintiff is a farmer in Emmanuel County, Georgia. In April 2009 Plaintiff planted tobacco on two plots of land: Unit 101 and Unit 104. On Unit 101 he planted 45 acres of irrigated flue cured tobacco. On Unit 104 he planted 44 acres of non-irrigated flue-cured tobacco. Plaintiff insured both units with the Great American Insurance Company ("Great American").

The centerpiece of Plaintiff's crop insurance policy, or any crop insurance policy for that matter, was the "production guarantee." When a farmer makes a claim, the loss incurred is determined by imputing the production guarantee into a mathematical formula. The production guarantee is, essentially, the number of pounds of harvested tobacco a farmer may insure on any given plot of land, and it is usually measured in pounds per acre. The production guarantee is calculated using either (1) the farmer's previous production history on the specified land or (2) if no production history is available on the specified land, county actuarial tables. Plaintiff had never farmed on Unit 104, thus Great American relied upon the county actuarial tables to calculate his production guarantee. Plaintiff's 2009 production guarantee was 1,580 pounds per acre for Unit 101 and 1,510 pounds per acre for Unit 104. His total guarantee (the

2

production guarantee times the insured acreage) was 71,100 pounds for Unit 101 (45.0 acres X 1,580 lbs.) and 66,440 pounds for Unit 104 (44.0 acres X 1,510 lbs.).

On August 7, 2009, Plaintiff filed a notice of loss on Unit 104 due to drought and wind damage. On August 12, 2009, insurance adjuster Ned Day inspected Plaintiff's insured tobacco. Day estimated that Unit 101 would produce 2,188 pounds of tobacco per acre (i.e., 98,460 lbs. total) and Unit 104 would produce 2,207 pounds of tobacco per acre (i.e., 97,108 lbs. total). Because Day's estimated production per acre exceeded Plaintiff's production guarantees, Day estimated that Plaintiff would have no need to file a claim.

After harvesting the tobacco, Plaintiff reported that: (i) Unit 101 (the irrigated plot) produced 177,099 pounds of tobacco,[1] of which 101,657 pounds were sold to Market Center Planters ("MC Planters") for $165,042; and (ii) that Unit 104 (the non-irrigated plot) produced only 13,394 pounds of tobacco, which was sold to MC Planters for $18,515.85. Thus, according to Plaintiff's reported crop yields, Unit 101 exceeded its

---

[1] The Court notes that despite its efforts, it could determine neither the source nor significance of this number. The Court could only determine that, for purposes of this case, it is largely irrelevant. The Government cited this number in its complaint to the ALJ, but the Government's main investigator, Randy Upton, later recanted its use and clarified that the operative number was really the 101,657 pounds sold to MC Planters. (See Transcript, p. 174-75.)

production guarantee by 30,557 pounds[2] while Unit 104 missed its production guarantee by 53,046 pounds. In December 2009 Plaintiff made a claim on Unit 104 for a loss of $104,429. In January 2010, Plaintiff collected an indemnity payment of $104,429.00 minus credits due to Great American, for a net payment of $72,688.

Around 2009, the Office of Inspector General in North Carolina received information about a major scheme by tobacco producers to defraud the federal crop insurance program. During its investigation, the Government subpoenaed records from Independent Tobacco Services, Inc. ("ITS"). Randy Upton, an investigator with the Risk Management Agency for the Department of Agriculture ("RMA"), sought records of tobacco producers in Georgia who failed to meet their 2009 guarantees by more than 50,000 pounds. Mr. Upton identified Plaintiff as falling within this category, and, in 2012, began to investigate Plaintiff.

On October 31, 2012, Mr. Upton conducted an interview with Plaintiff at the Farm Service Agency office in Swainsboro, Georgia. During the interview, Mr. Upton inquired into the specifics of Plaintiff's 2009 tobacco crop. Of particular interest to Mr. Upton was Plaintiff's sale of approximately 29,000 pounds of tobacco to ITS in 2009. Plaintiff initially did not recall any sales to ITS,

---

[2] Once again, the Court notes that it is using only the 101,657 pounds to determine the excess of the production guarantee, not the 177,099 pounds cited in the United States' complaint.

but when informed that Joseph Boyett bought tobacco on behalf of ITS, Plaintiff speculated that it was probably trash tobacco or might have been tobacco left over from previous years ("carryover tobacco").

Based upon this interview and the results of his investigation, Upton hypothesized that Plaintiff did not suffer losses from a drought but instead (1) shifted some of his production from Unit 101 to Unit 104 and (2) sold Unit 104 tobacco to ITS. Upton's hypothesis went as follows:

- Plaintiff exceeded his production guarantee by 30,000 pounds on Unit 101 and missed his production guarantee by 54,000 pounds on Unit 104.
- Plaintiff sold 29,000 pounds to ITS which he claimed was carryover tobacco from 2006.
- Assume that the 30,000 overproduction in Unit 101 was really production from Unit 104.
- Assume also that the 29,000 sold to ITS was not carryover tobacco from 2006, but was instead production from Unit 104.
- The sum of 30,000 (the overproduction from Unit 101), 29,000 (the alleged carryover tobacco), and 14,000 (Plaintiff's reported production from Unit 104) is 73,000 pounds.
- 73,000 pounds is only slightly greater than the original 66,400 pound production guarantee for Unit 104.
- Additionally, if Plaintiff had shifted the 30,000 pounds from Unit 104 to Unit 101, then Unit 101 would have produced only 71,000 pounds (101,000 - 30,000 = 71,000) — almost exactly the original production guarantee for Unit 101.

Thus, Upton concluded, after taking into account the adjuster's prediction that both Unit's 101 and 104 would hit their production guarantees, Plaintiff must have shifted production from Unit 104 to Unit 101.

At the conclusion of his investigation, Mr. Upton referred Plaintiff to the United States Attorney's Office. In December

2012, Plaintiff and his attorney met with Assistant United States Attorney Edgar Bueno. Plaintiff explained that the tobacco he sold to ITS in 2009 was carryover tobacco he had grown in 2006 but stored because of unfavorable market conditions. Plaintiff also provided the United States Attorney's Office with evidence supporting the existence of a drought in 2009. The United States Attorney's Office declined to prosecute Plaintiff and referred the case back to the RMA for administrative review.

On April 25, 2014, the RMA recommended that Great American void Plaintiff's policy. The RMA wrote that "[a]n analysis by PRISM weather experts disclosed that drought conditions did not exist in Emanuel County, Georgia in 2009." (CX-22, at 3.) Subsequently, Plaintiff and Great American engaged in federally-mandated arbitration. The arbitration, however, did not focus on Plaintiff's drought claim. Rather, it focused on Plaintiff's failure to report the tobacco he claimed to carryover from 2006.

Plaintiff's insurance policy required Plaintiff to submit an acreage report every year. The policy required Plaintiff to include in his acreage report, inter alia, any "carryover tobacco from previous years." (RX-14, at 36.) The insurance policy defined carryover tobacco as "[a]ny tobacco produced on the FSA farm serial number in previous years that remained unsold at the end of the most recent marketing year." (Id. at 35.) Incorrectly reporting "any information on the acreage report for any crop year" could result in repayment of benefits by the insured "if the

6

correction of any misreported information would affect an indemnity, prevented planting payment[,] or replant payment that was paid in a prior crop year." (Id. at 15.)

Using Plaintiff's failure to report any carryover tobacco on his 2009 acreage report, Great American sought to void the 2009 policy and avoid making payment on a claim submitted by Plaintiff in 2012. The arbitrator ruled in favor of Plaintiff, finding that the failure to include the 2006 carryover tobacco was: (1) **NOT** intentional" because "[t]he overwhelming weight of the evidence was that Mr. Lane did not attempt to conceal anything and did not have knowledge that the information provided in the Acreage Reports and the Production Reports was false"; and (2) **NOT** material" because "the failure to list the Carryover Tobacco . . . (i) in no way affected any decision making by [Great American] (or, for that matter, by USDA or any division thereof); (ii) in no way affected [Great American's] ability to adjust any claim or loss; and (iii) in no way affected premiums charged to Mr. Lane as the insured or otherwise caused a monetary loss to the crop insurance program." (RX-36, at 5-6 (emphasis in original).)

In December 2014, the Government brought an administrative action against Plaintiff seeking the maximum penalty of a five year disqualification from participation in government crop programs as well as the imposition of an $11,000 fine. In its complaint, the Government alleged that "drought conditions did not exist in Emanuel County, Georgia in 2009" and thus Plaintiff

made a false crop insurance claim. The Government also alleged that Plaintiff "knowingly and intentionally, misrepresented material and relevant fact [sic] pertaining to [his] policy" when he "did not report alleged carryover tobacco on his acreage report, filed false Notice of Loss, and signed a 2009 loss claim production worksheet that cause [sic] an incorrect indemnity payment to be made to him." (Government's Administrative Complaint.) The Government's complaint cited as its supporting evidence, among other things, PRISM weather reports casting doubt on the existence of a drought, loss adjuster Day's prediction that Units 101 and 104 would exceed their production guarantee, Plaintiff's allegedly inconsistent October 2012 interview, and Plaintiff's failure to report any carryover tobacco.

In June 2015, ALJ Janice K. Bullard held a two-day hearing in Swainsboro, Georgia. The ALJ heard evidence from several sources, including Mr. Lane.

Christopher Webb, Plaintiff's long-time crop insurance agent, testified that he prepared Plaintiff's acreage reports for the years 2006, 2007, 2008, and 2009, and that Plaintiff did not report any carryover crop during those years. Webb testified that the form he uses does not include a special place to report carryover tobacco, but he would have noted any carryover in the remarks section of the form. Webb also testified that, although he prepared Plaintiff's notice of loss

for wind damage, he did not prepare Plaintiff's notice of loss for drought. According to Webb, Plaintiff's notice of loss for drought was irregular because it included a claim number, which is normally not assigned until after the notice is submitted, and the notice identified a future, rather than present, loss.

Ned Day, the insurance adjuster who inspected Plaintiff's 2009 crop, testified that at the time of his crop inspection "both irrigated and non-irrigated crops looked to be good quality, although the non-irrigated may have had thinner leaves." (ALJ Decision, at 6.) Day further testified that "the tobacco was mature, and [he] saw no evidence of wind damage or damage due to drought." (Id.) Finally, Day stated that he "had never had an appraisal miss as much as the one he conducted of [Plaintiff's] 2009 tobacco crop." (Id. at 7.)

Randy Upton testified that he suspected Plaintiff was lying about the drought claim and had shifted some of his production from Unit 104 to Unit 101. He based this belief on Day's growing season inspection as well as the rough equivalence between Plaintiff's 30,000 pound over production on Unit 101 and his 53,000 pound underproduction on Unit 104. Upton agreed that based upon the price ITS paid Plaintiff for the tobacco it bought in 2009, the tobacco was "trash." (ALJ Decision, at 8.) Upton, however, "admitted that he had no idea where the tobacco [sold to ITS] came from, or when it was grown." (Id.)

Dr. Jeffrey Underwood testified as Plaintiff's expert on the weather conditions in the summer of 2009. At the time of the hearing, Dr. Underwood was the Chair of the Department of Geology and Geography at Georgia Southern University and was previously the official Nevada State Climatologist. Dr. Underwood testified that although April and May were quite wet, drought conditions existed in Emanuel County, Georgia in June and July of 2009. Dr. Underwood also noted that according to data gathered by the National Climatic Data Center, June through August 2009 in Georgia was "the sixth driest June through August" in 115 years of record keeping. (Transcript, at 530.)

Wesley Harris testified as Plaintiff's expert on the effects of the weather conditions on Plaintiff's tobacco plants. Mr. Harris earned a degree in agricultural engineering from the University of Georgia and at the time of the hearing had spent 27 years working for the Georgia agricultural extension service, much of which he spent helping farmers with the growth of nearly 4,000 acres of tobacco. Harris inspected Unit 104 in person and testified that the soil on Unit 104 was very sandy and had an "extremely, extremely limited" capacity to hold water. (Transcript, at 542.) He then testified that wet weather in the early part of the growing season can truncate a tobacco plant's root system, potentially causing a crop failure if the tobacco then goes through a hot, dry period. Harris testified that while the tobacco leaf might still look nice and green, it will

10

not ripen properly and will be worthless on the market. He then offered his expert opinion that 2009 "would have been an extremely challenging year. There's no way with the heavy impact of the saturated soils right after transplanting and then another shot right after that that we would have developed the root system to the point that we could sustain the type of dry hot weather that we had during the primary growing season." (Transcript, at 554.) According to Harris, the damage to Plaintiff's crop was complete by the time Plaintiff filed his notice in August 2009.

Allen Denton, a retired compliance investigator with the RMA, testified for the Government about the tobacco growing and harvesting process. Mr. Denton inspected pictures of Plaintiff's crop and testified that "based upon the date that Respondent planted his non-irrigated tobacco and the date on which [the] picture of the crop was taken, the tobacco was mature and ready to be harvested." (ALJ Decision, at 10.) He further testified that he "believed that only a catastrophic event would have prevented Respondent's crop from producing 2,000 pounds per acre, as appraised on August 12, 2009." (Id.)

Dan Johnson, John Paul Johnson, and Bobby Lane, all neighboring farmers, testified that they filed claims for losses due to drought in 2009.

Finally, Burt Rocker, one of Plaintiff's neighbors, and Dr. Ricky Lane, Plaintiff's brother, testified that they witnessed

Plaintiff's stored carryover tobacco. Mr. Rocker testified that when he was on Plaintiff's land in early 2007, he saw tobacco barns full of tobacco. He remembered this event because it was the wrong time of year to have tobacco in storage and normally tobacco would have been sold by then. Dr. Lane testified that in 2007 or 2008 he observed tobacco in Plaintiff's warehouse. Dr. Lane also took note of this fact because he was visiting in the winter months and tobacco is not usually stored at that time.

On April 5, 2016, the ALJ issued an order finding Plaintiff "willfully and intentionally provided false or inaccurate information to the Federal Crop Insurance Corporation [("FCIC")] or to [Great American] with respect to an insurance plan or policy under the Federal Crop Insurance Act [(the "Act")]." (ALJ Decision, at 28.) The ALJ began her discussion by noting that "[t]he gravamen of the instant matter is whether or not [Plaintiff] experienced loss of his non-irrigated tobacco crop due to drought in 2009, or whether he filed a false claim of law." (Id. at 18.) The ALJ found that "the preponderance of the evidence supports the conclusion that [Plaintiff] did not suffer the loss that he reported" (id. at 19) and that "[Plaintiff] failed to report carryover tobacco in 2006, 2007, 2008, and 2009, which constitutes a serious lapse in his responsibilities under the crop insurance program" (id. at 24.). The ALJ imposed an $11,000 fine and a disqualified Plaintiff

"for five years from receiving any monetary or non-monetary benefit under various statutory provisions [as well as] any law that provides assistance to a producer of an agricultural commodity affected by a crop loss or a decline in the prices of agricultural commodities." (Doc. 15, at 6.)

Plaintiff appealed the ALJ's decision. The Judicial Officer upheld the ALJ's decision. Plaintiff now seeks judicial review from this Court.

## II. STANDARD OF REVIEW

"[W]hen a party seeks review of agency action under the [Administrative Procedures Act ("APA")], the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." American Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001). "Accordingly, the standard set forth in Rule 56 does not apply because of the limited role of a court in reviewing the administrative record. Summary judgment is the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." CS-360, LLC v. U.S. Dep't of Veterans Affairs, 101 F. Supp. 3d 29, 32 (D.D.C. 2015) (citations and internal quotations omitted).

"Under the [APA], [a court] may set aside a decision of a federal agency only if it is 'arbitrary, capricious, an abuse of

discretion, unconstitutional, in excess of statutory authority, without observance of procedure as required by law, or unsupported by substantial evidence.'" Alma Brightleaf, Inc. v. Federal Crop Ins. Corp., 552 F. App'x 861, 864 (11th Cir. 2013) (quoting Mahon v. U.S. Dep't of Agriculture, 485 F.3d 1247, 1252 (11th Cir. 2007)). "The 'arbitrary and capricious' standard is exceedingly deferential." Jones Total Health Care Pharmacy, LLC v. Drug Enforcement Agency, 881 F.3d 823, 829 (11th Cir. 2018) (quoting Defs. Of Wildlife v. U.S. Dep't of Navy, 733 F.3d 1106, 1115 (11th Cir. 2013)). Courts "may not substitute [their] own judgment for that of the agency so long as its conclusions are rational and based on the evidence before it." Id. (citing Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009)).

Courts, however, "may set aside a decision as 'arbitrary and capricious when, among other flaws, the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency.'" Id. (quoting High Point, LLLP v. Nat'l Park Serv., 850 F.3d 1185, 1193-94 (11th Cir. 2017)). A decision is "unsupported by substantial evidence" when it lacks "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Alma Brightleaf, Inc., 552 F. App'x at 864 (quoting Stone and Webster Constr., Inc. v. U.S.

_Dep't of Labor_, 684 F.3d 1127, 1133 (11th Cir. 2012)). But "[a]n administrative agency's finding is supported by substantial evidence even if two inconsistent conclusions could be drawn from the evidence." _Jones Total Health_, 881 F.3d at 829 (internal quotations and citations omitted).

## III. DISCUSSION

The question presented by the ALJ was "[w]hether [Plaintiff] willfully and intentionally provided false or inaccurate information with respect to a policy or plan of insurance to FCIC or any approved insurance provider, or failed to comply with a requirement of FCIC." (AJL Decision, at 1.) The ALJ found in the affirmative. This Court finds that part of the ALJ's decision was arbitrary and capricious and part of its decision was supported by substantial evidence.

### A. Applicable Law

"A . . . person that willfully and intentionally provides any false or inaccurate information . . . to an approved insurance provider with respect to a policy or plan of insurance" or "willfully and intentionally fails to comply with a requirement of the [FCIC]" may be subject to civil fines or disqualification from receiving monetary or nonmonetary benefits under federal farm programs. 7 U.S.C. § 1515(h)(1)-(3). Federal regulations further provide that "[d]isqualification and civil fines may be imposed on any participant or person who

willfully and intentionally: (1) [p]rovides any false or inaccurate information to FCIC or to any approved insurance provider with respect to a policy or plan of insurance authorized under the Act either through action or omission to act when there is knowledge that false or inaccurate information is or will be provided; or (2) Fails to comply with a requirement of FCIC." 7 C.F.R. § 400.454(b)(1)-(2).

"Disqualification and civil fines may only be imposed if a preponderance of the evidence shows that the participant or other person has met the standards contained in § 400.454(b). FCIC has the burden of proving that the standards in § 400.454(b) have been met." 7 C.F.R. § 400.454(A)(3). "Disqualification and civil fines may be imposed regardless of whether FCIC or the approved insurance provider has suffered any monetary losses. However, if there is no monetary loss, disqualification will only be imposed if the violation is material in accordance with § 400.454(c)." 7 C.F.R. § 400.454(A)(4).

"Willful and intentional" means "[t]o provide false or inaccurate information with the knowledge that the information is false or inaccurate at the time the information is provided; the failure to correct the false or inaccurate information when its nature becomes known to the person who made it; or to commit an act or omission with the knowledge that the act or omission is not in compliance with a 'requirement of FCIC' at the time

the act or omission occurred. No showing of malicious intent is necessary." 7 C.F.R. § 400.452. "Material" is defined as "[a] violation that causes or has the potential to cause a monetary loss to the crop insurance program or it adversely affects program integrity, including but not limited to potential harm to the program's reputation or allowing persons to be eligible for benefits they would not otherwise be entitled." Id.

## B.   The ALJ's Decision

The ALJ made three findings.   First, she found that Plaintiff's 2009 Unit 104 tobacco crop did not suffer a loss due to drought.   Second, she found that Plaintiff willfully and intentionally failed to report carryover tobacco from 2006. Third, she found that the arbitration decision in favor of Plaintiff and against Great American did not preclude suit by the Government.   This Court finds the ALJ's first conclusion to be arbitrary and capricious but the second conclusion to be supported by substantial evidence.   Additionally, the Court finds that Plaintiff has not met his burden of demonstrating that the arbitration decision precluded suit by the Government.

### 1.   The ALJ's Finding that Plaintiff Suffered No Loss

The foundation of the ALJ's decision that Plaintiff suffered no loss is Day's inspection.   The ALJ found that Day's inspection demonstrates Plaintiff could not have suffered a

17

loss.  After setting this foundation,[3] the ALJ found that: (1)
Plaintiff's explanation of carryover tobacco cannot be believed
because, among other things, Plaintiff is not a credible
witness; (2) Plaintiff's expert witness testimony demonstrating
the effect of the wet-dry weather pattern on the non-irrigated
crop must be discounted; and (3) no evidence established that
the 25,000 pounds of tobacco sold to ITS did not come from
Plaintiff's 2009 crop.  (ALJ Decision, at 21.)  The ALJ
concluded by reasoning that while "it is speculative to conclude
that some of the excess production sold from Unit 101 came from
Unit 104, . . . the evidence demonstrates that at least some of
the 25,000 pounds of the crop sold to ITS represents unreported
tobacco harvested by [Plaintiff] in 2009, even crediting that
some of the tobacco was trash tobacco from the non-irrigated
acreage and some carry over tobacco."  (Id. at 23.)

    The overarching problem with the ALJ's finding is that it
relies on only one piece of concrete evidence: Day's growing
season inspection.[4]    The ALJ cites no concrete evidence

---

[3] The Court notes that while it presents the ALJ's arguments in a
chronological order, the ALJ did not craft her opinion in this
chronological way.  The Court merely re-presents the ALJ's opinion in
this manner for the sake of clarity.
    [4] Even Day's growing season inspection, however, is not entirely
persuasive.  The inspection consisted of Day measuring the number of
tobacco stalks, counting the leaves on a sample of tobacco plants, and
estimating how many leaves were in the 40 acres on Plaintiff's Unit
104.  Day then used a handbook to determine how many pounds of tobacco
would result from the estimated leaf total assuming the leaves would
mature properly.  Day testified at trial that his inspection was not
related to the claim filed by Plaintiff, and that it was not an

indicating that a drought did not occur, no concrete evidence that the drought, if it did occur, would not have had or did not in fact have a deleterious effect on Plaintiff's tobacco crop, and no concrete evidence, despite hearing testimony from the ITS purchaser, that the tobacco sold to ITS came from Plaintiff's 2009 crop. Instead the ALJ fills her opinion with explanations of why she does not believe Plaintiff's story. She cites the fact that she does not find Plaintiff credible, she cannot find any evidence establishing the source of the crop sold to ITS, and she does not agree with Plaintiff's agricultural expert.

The second problem, which stems from the first, is that the ALJ's opinion works almost to switch the burden of proof from the Government to Plaintiff. The vast majority of the ALJ's decision consists of explaining why the ALJ does not believe Plaintiff's version of events, and it is filled with conclusions rejecting Plaintiff's arguments: "[R]espondent's explanation for carrying tobacco is not supportable" (ALJ Decision, at 20); "the preponderance of the evidence does not support [Plaintiff's] version of events" (id.); "Plaintiff undoubtedly sold 25,000 pounds of tobacco to ITS that he failed to report but the evidence does not establish the source of the crop" (id.); "the

---

entirely accurate prediction of the expected yield. According to Day, "the actual production could be very different than [the appraisal estimate]." (Transcript, at 103.) Furthermore, Day testified that "another thing about these appraisals, you got to go by what the book says. You know that's all you can do. And it's nothing saying its exact, like I told that other lawyer . . . . It's just something to give you an idea what he's got out there." (Id. at 105.)

preponderance of the evidence does not support that drought conditions ravaged the non-irrigated crop" (id.); and "the preponderance of the evidence does not support that all of the unreported crop that [Plaintiff] sold in 2009 represented the at most dozen bales that Dr. Lane observed repeatedly in the winter months of 2007 and 2008" (id. at 23-24). The decision is largely devoid, however, of any explanation concerning the Government's arguments. The ALJ fails to reference any substantive Government evidence, other than the Day inspection, showing that Plaintiff's crops were not ravaged by drought. Thus, the ALJ appears to have presumed the Government was correct and required that Plaintiff prove otherwise.

The third problem, which, like the second, also stems from the first, is that the ALJ's conclusion is almost entirely speculation. The ALJ's decision rests upon two main premises: (1) Day's inspection proves Plaintiff suffered no loss and (2) Plaintiff's sale to ITS was actually a way to dispose of his healthy Unit 104 tobacco. While the ALJ relies on at least one concrete piece of evidence – the Day inspection – to prove the first premise, she cites no concrete evidence supporting the second. She writes that "the evidence demonstrates that at least some of the 25,000 pounds of the crop sold to ITS represents unreported tobacco harvested by [Plaintiff] in 2009, even crediting that some of the tobacco was trash tobacco from the non-irrigated acreage and some carry over tobacco," thus

20

Plaintiff "knowingly and intentionally provided false information when he certified the production worksheet for Unit 104." (ALJ Decision, at 23.) The ALJ, however, cites no evidence in support of this assertion. To the contrary, she admits that "the evidence does not establish the source of the crop [sold to ITS]." (ALJ Decision, at 23 (emphasis added).)

Additionally, when asked at trial whether he had any "direct evidence whatsoever that [Plaintiff] grew [the carryover tobacco] in 2009," Upton, the Government's chief investigator, responded: "The only thing I have is what Mr. Day told me that he thought the tobacco claim was suspicious because he only produced 300 pounds [per acre]." (Transcript, at 161.) Upton further admitted that despite reviewing "all of the records that were available" and "interview[ing] everybody [he] knew that had anything to do with" this case, "not one witness" ever told him that Plaintiff grew the tobacco sold to ITS in 2009. (Id.) Thus, a central pillar of the ALJ's opinion, that Plaintiff must have disposed of his healthy Unit 104 tobacco by selling it to ITS, is completely without any supporting evidence other than the ALJ's conclusion that she does believe Plaintiff's story.[5]

The ALJ further speculated when discounting the eyewitness testimony offered by Plaintiff showing that he did have

---

[5] Interestingly, this brings the Court right back to problem number two: the ALJ appears to have placed the burden on the Plaintiff to prove he didn't make a false claim rather than on the Government to prove he did.

significant carryover tobacco from 2006. The ALJ reasoned that "[t]he amount of tobacco that [Plaintiff] has said was held over is questionable, given the contradiction between Mr. Rocker's observation that [Plaintiff's] barns were full of tobacco when he would have expected the crop to have been sold and Dr. Lane's description of some bales of tobacco that did not fill a warehouse." (ALJ Decision, at 20.) But as Plaintiff points out, "there is no record of the size difference between Mr. Lane's tobacco barns and the size of the warehouse at issue." (Doc. 11, at 22.) In fact, Plaintiff contends that the warehouse is "substantially larger than the smaller portable tobacco barns." (Id.) Indeed, should this be the case, the contradiction cited by the ALJ would be no contradiction at all. Thus, the ALJ's discounting of the eyewitness testimony on the basis of a "contradiction" is not supported by any evidence in the record.

Finally, in the same paragraph asserting the "contradiction" between the testimony of Rocker and Dr. Lane, the ALJ writes that while she "accords weight to Dr. Lane's testimony that [Plaintiff] stored some tobacco out of season, . . . the tobacco could easily have been the bales of trash tobacco that [Plaintiff] testified he collects during the growing season." (ALJ Decision, at 20.) As Plaintiff notes in his brief, however, "this is speculation, pure and simple." (Doc. 11, at 23.) The ALJ provides no evidence that the bales

the eyewitnesses saw were not from the 2006 harvest. The ALJ is right to state that the origin of the stored tobacco is uncertain, but because the Government has the burden of proof, uncertainty must weigh in favor of Plaintiff. The ALJ must make a determination based on the evidence the Government presents and determine whether the Government has met its burden of proof. Because the ALJ references no evidence supporting her assertion, the Court must conclude that this assertion is mere speculation.

The fourth problem is that the ALJ ignores the great weight of evidence put forth by Plaintiff demonstrating the he did suffer a loss. Plaintiff offered two expert witnesses on the weather pattern and tobacco agronomy. The Government offered none. The Plaintiff's expert witnesses testified to two important facts. First, Dr. Underwood testified that in 2009 Emanuel County experienced a wet spring followed by an extremely dry summer. Second, Wesley Harris testified that: (1) the wet spring would cause the tobacco plants to grow shallow roots, and that the shallow roots would cause the plants to struggle in the dry summer;[6] (2) he had examined the soil of Unit 104 and it had

---

[6] Specifically, Harris testified that "wet weather in the early part of the season, a month or so after transplanting" would have

    a deleterious effect. All of the literature that you see on
    particularly irrigation scheduling warns against that. And then
    the implication is that if you saturate the soil you create
    anaerobic conditions down there, which will truncate the root
    mass. And that creates at that point an imbalance, like I was

a very limited capacity for holding water;[7] (3) while the tobacco plants might have looked healthy because they were green, the lack of water would have severely hampered their ability to mature properly;[8] and (4) the damage to the crops was complete by the time Day conducted his inspection.[9]

---

talking about between the root structure and the leaf structure. And if it is dryland tobacco and that tobacco goes into a different stress period, either from a combination of heat and dry weather or long term dry weather scenarios, it can create a crop failure.

(Transcript, at 549.)

    [7] Harris testified that the soil on Unit 104 was consistent with the soil in that area of Georgia. When asked to describe the "water holding features or capacities of that soil type," Harris opined:

Unfortunately since we have extremely low cation exchange capacities in most east Georgia soils and very low organics our water holding capacity is extremely, extremely limited. If we don't have pretty much regular rainfall or supplement it with irrigation over that period of time it's extremely difficult to be successful in producing a crop.

(Transcript, at 542.)

    [8] Harris testified that tobacco needs "between an inch and a quarter to an inch-and-a half [of rain] per week" to be healthy. If the tobacco doesn't get the needed rain:

[A] couple of things will happen. Number one, the energy production in the plant from the -- all the way down to the mitochondrion on up, begins to cease to function in a strong position. We go into almost dormancy type thing. And with tobacco where you're dealing with a very turgid and heavy leaf, once it starts to lose that capacity to continue to mature then it won't get to the point where it will actually ripen effectively. And then you'll have essentially a nice leaf out there, but it will be worthless to the cigar/cigarette manufacturer.

(Transcript, at 551 (emphasis added).) Additionally, when show a picture of the crop, Harris opined that

24

The ALJ, however, ignored Plaintiff's persuasive evidence. While the ALJ appeared to accept Dr. Underwood's testimony that Emanuel County experienced a wet spring followed by an extremely dry summer, she dismissed Harris' testimony that the truncated root system created by the wet spring would have harmed the plant in the dry summer. The ALJ reasoned that "I accord little weight to the opinion of agricultural expert Wesley Harris that wet weather early in the season would have a bad effect on the crop, as the rain fell on both irrigated and non-irrigated fields, and the irrigated unit produced tobacco in excess of the production guarantee." (ALJ Decision, at 21.) But this

---

for it to be as dark green as it is, it expresses and basically verifies my point of the type of weather conditions that he had, allowed for a reduction in the root system as well as a reduction in the ability of the plant to grow as it should have. And, therefore, we didn't utilize the nitrogen that he had put on the plant early to sustain it, until it got to this point where it kicked back in - literally kicked back into gear with more favorable weather and that's why it's so green and the only way we could even begin to salvage this crop, which essentially won't happen.

(Transcript, at 557.)

[9] Examining a picture of the crop during Day's growing season inspection, and taking note of the time of year the picture was taken as well as the time the tobacco was planted, Harris answered the question of whether the tobacco had "much of an opportunity . . . to recover and develop a marketable leaf that year":

Once you get to that stage and, again, without being right on top of it, I can't ascertain how much of that is sucker growth and how much, you know, is actual prime leaf. But the reality would be once we get this late in the year we start running out of daylight hours to be able to effectively ripen the tobacco.

(Transcript, at 558.)

conclusion misunderstands the critical distinction between irrigated and non-irrigated crops. Irrigated crops have access to water. Non-irrigated crops do not. Thus, although the irrigated and non-irrigated crops both experienced a wet spring, the irrigated crops were better able to withstand the ensuing dry summer because they had artificial access to water while the non-irrigated crops suffered because they were completely at the mercy of the weather. The ALJ's dismissal of Harris' testimony is troubling both because it wrongly dismisses persuasive evidence that Plaintiff's crops did suffer a loss due to drought and because it demonstrates a fundamental misunderstanding of the science surrounding crop growth — science that is vital to assessing the Government's complaint against Plaintiff.[10]

---

[10] Indeed, Plaintiff's tobacco expert explained this principle in detail at trial:

Drought is a problem, obviously, to any plant. But it is exacerbated significantly when you have high temperatures to go along with it. If any of us recall the week or two of weather we have had you certainly can relate to that very effectively. In this particular case not only did we have a relatively prolonged period of in excess of 30 days with less than two inches of rain we also had significantly high temperatures in there not only from the maximum side of it, but also from the minimum side. If we maintain nighttime temperatures as a low in the 75, 74, 76 degree range the plant literally does not respire at night. If it doesn't respire at night it can't go back into an energy state again.

That would indicate to me those two scenarios right there, that the opportunity to produce a good quality tobacco crop would be almost impossible. And that's why we are, you know, we like to see the capacity to irrigate because we could have gone in there even with a truncated and minimal root system we could have augmented the -- not only the moisture capability, but also reduced some of the temperature at that particular point during that critical stage.

The fifth problem is that the ALJ's opinion is inconsistent and based on distortions of the record. The first, and perhaps most visible, distortion of the record is the ALJ's characterization of Plaintiff's testimony. The ALJ wrongly states that Plaintiff "admittedly lied to Investigator Upton during their [October 2012] interview" and "[a]t the hearing before me, [Plaintiff] admitted that he was not truthful with Mr. Upton." (ALJ Decision, at 19, 22.) The full context of Plaintiff's testimony cited by the ALJ, however, demonstrates that Plaintiff never admitted that he "lied" to Upton:

| | |
|---|---|
| **Plaintiff:** | Everything in that [October 2012] interview and in here nothing was accurate. I was trying to remember. <u>Everything that I told him was the best that I could remember at the time. Maybe some — some of it may be accurate and some of it not, you know, I'm setting there trying to remember</u>. We have picked out trash before, but we would sell it at the end of the year with the crop. And if you'll look — |
| **Prosecutor:** | So you are admitting you did that to have trash tobacco in 2009 that you sold in 2009? |
| **Roundtree:** | Objection. That's not accurate. That's not what the man said at all. |
| **Prosecutor:** | What were you saying? |
| **Court:** | No. Mr. Lane is saying that he didn't tell the truth here. . . |

(Transcript, at 387-88 (emphasis added).) Plaintiff clearly stated that "[e]verything I told him was the best that I could

_____

(Transcript, at 555 (emphasis added).)

remember at that time." (Id.) Plaintiff did not admit that he lied. Thus, not only did the ALJ wrongly characterize Plaintiff's testimony, the ALJ wrongly characterized Plaintiff's testimony on one of the most critical, and hotly contested, issues in the entire case.

The ALJ also distorted the record when she characterized Rex Denton as a "tobacco expert." When discussing why she discounted Plaintiff's testimony, the ALJ wrote that "[t]obacco expert Rex Denton testified that 21 days without rain after the crop was appraised on August 12, 2009, would have had little effect on the crop." (ALJ Decision, at 21.) Denton, however, was never identified, proffered, nor qualified as an expert. (Doc. 11, at 17.) Indeed, the transcript shows that even the ALJ agreed Denton was not a tobacco expert:

> **Roundtree:** Your Honor, if the witness is about to be asked to comment on the tobacco that's in this picture, I want to lodge an objection. First that the witness' expertise in this tobacco has not been established and, therefore, there's no foundation with that. And, second, this witness has not been identified as an expert in tobacco. He was identified as a -- Mr. Denton is expected to testify as to his participation in the tape recorded interview of [Plaintiff] on October 31st, 2012. And I would suggest that it's inappropriate for this witness' testimony to exceed that description.

> **Court:** Well, I hear what you're saying. I sustain your objection on the first grounds. Despite the fact that Mr. Denton has been -- his testimony now already has gone far afield from what has been intimated, I have

numerous questions to ask somebody about the Risk Management Agency's expectations of filing claims, and tobacco claims and I believe that Mr. Denton would be the appropriate person to answer those. So as for asking Mr. Denton questions about a photograph, I really think that it's not very probative unless you're going to establish that he actually saw the crop. I mean --

**Simpson:** No, we are not going to establish that he was there and saw the crop. But he has extensive experience in tobacco. He has been a tobacco farmer for years.

**Court:** Right. I don't think you have to be an expert, Mr. Roundtree, to give your opinion about whether a crop looks good or not. But I think -- I guess what I'm saying to you it has limited probative value in this instance because it's a photograph. I mean, you -- I think you'd have to ask a whole lot of questions to establish that a photograph is as good -- will give a witness as good an opportunity to make an opinion about the quality of the crop. So you can try to do that.

I don't think we need him to be qualified as an expert to ask questions about his opinion of farming or tobacco or routines involving tobacco. I believe Mr. Denton has established he's familiar enough with it. We are not asking an opinion about anything that I think is even probative to the issue. But I do think you have to make some -- lay some foundation, Mr. Simpson, about whether or not any photograph, with any crop is enough to give someone the basis to say whether the crop is good, bad, routine, usual, unusual.

**Simpson:** Well, I guess I'm not sure why this picture would not be enough for somebody who knows tobacco, knows the planting date, knows the --

**Court:** Well, I said you're going to have to establish that with foundational questions.

(Transcript, at 241-43 (emphasis added).)

Finally, the ALJ again distorted the record to support her conclusion that "[Plaintiff's] explanation for carrying over tobacco is not supportable." (ALJ Decision, at 20.) The ALJ states that:

> [Plaintiff] maintained that tobacco would deteriorate every year that it is stored, or at least turn darker, which was the reason he could not sell it in the first place. Mr. Boyett agreed that tobacco carried over for years would be worthless. Despite the risk of further reducing its value, Respondent purportedly kept the tobacco in question for three years.

(Id.) The ALJ's reasoning commits two errors. First, Boyett did not "agree[] that tobacco carried over for years would be worthless." (ALJ Decision, at 20.) What Boyett actually said was "I don't think you could keep trash tobacco for three years. It'd be bad enough as it was, but at the end of three years you would not have anything to amount to anything." (Transcript, at 226 (emphasis added).) Second, although it is technically true that Plaintiff did not sell the tobacco because it was too dark, the ALJ's characterization does not tell the full story. Plaintiff testified that purchasers will oscillate between desiring darker or lighter color tobacco.[11] When Plaintiff tried

---

[11] This fact was also supported by Boyett's testimony. When asked whether tobacco companies sometime prefer a darker and sometimes a lighter tobacco, Boyett testified that the tobacco companies "buy

to sell his 2006 tobacco, the purchasers would not pay him what he thought it was worth because they wanted a lighter color tobacco. Because he thought the tobacco was high quality, he decided to hold it over and try to sell it the next year for a better price in hopes that darker tobacco would be in higher demand. By 2009, Plaintiff realized that he was not going to be able to recoup his losses. Thus, he determined that "a little bit [of cash] is better than nothing," and he sold his tobacco on the cheap. (Transcript, at 365.)

In sum, the Court finds that the ALJ's decision with regards to Plaintiff's reported crop failure was "arbitrary and capricious," because the ALJ's decision was not supported by substantial evidence and the ALJ "offered an explanation for its decision that [ran] counter to the evidence before the agency." Jones Total Health, 881 F.3d at 829. The ALJ placed more weight on Day's inspection than it was meant to bear, repeatedly misconstrued the record, and unreasonably discounted Plaintiff's substantial expert testimony. Additionally, the Court finds that the ALJ's opinion constitutes an abuse of discretion because it fails to place the burden of proof upon the Government. Thus, the Court **VACATES** the ALJ's decision finding that Plaintiff did not suffer a loss on his Unit 104 tobacco.

---

according to the customer's demands' and would at times "discriminate against the darker tobacco." (Transcript, at 230.)

## 2. The ALJ's Finding that Plaintiff Willfully and Intentionally Failed to Report His Carryover Tobacco

The ALJ found that "[i]n addition to failing to accurately report the source of tobacco that [Plaintiff] sold in 2009, [Plaintiff] failed to report carry-over tobacco in 2006, 2007, 2008, and 2009, which constitutes a serious lapse in his responsibilities under the crop insurance program." (ALJ Decision, at 24.) The ALJ reasoned Plaintiff's excuse that he did not know he needed to report his carryover tobacco was not enough, because "ignorance of reporting requirements does not excuse him from failing to comply with FCIC's guaranteed tobacco crop provisions." (Id.) Additionally, the ALJ noted that Plaintiff's "assertion that he believed he did not have to report production over his guarantee is at odds with his report of excess production from Unit 101 in 2009." (Id.)

Plaintiff argues that "there is no evidence that [he] willfully and intentionally failed to comply with any requirement of FCIC." Plaintiff further argues that the Acreage Reporting Form provided by Great American support his position because it contains no place to report carryover tobacco. (Doc. 11, at 24.) Additionally, Plaintiff contends that "there is also no evidence that [his] omission would have in any way affected [his insurance policy]." (Id.) He buoys this position by asserting "the current policy does not even require carryover tobacco to be included on the acreage report." (Id.)

The Court finds that the ALJ did not err in finding that Plaintiff willfully and intentionally failed to report his 2006 carryover tobacco. The Guaranteed Tobacco Provisions defines carryover tobacco and states that carryover tobacco must be included in the insured acreage report. Furthermore, the ALJ could have made a finding on whether Plaintiff "intentionally and willfully" refused to report the carryover tobacco based on the credibility of Plaintiff's testimony combined with the other testimony offered at trial. Thus, the Court concludes that the ALJ's decision was "rational and based on the evidence before it." Jones Total Health, 881 F.3d 823, 829 (11th Cir. 2018).

## C. Issue Preclusion

Plaintiff's final argument is that the federally mandated arbitration between himself and Great American precludes suit by the Government. According to Plaintiff, he "has been forced by the Government to re-litigate the identical issues in this case twice and this action is barred by issue preclusion." (Doc. 11, at 24.) Plaintiff argues that the RMA controlled the arbitration "[d]ue to its high level of involvement and direction at every single level," and that "[Great American] had the identical interest as the Government at Arbitration." (Id. at 25.)

"A court may give preclusive effect to a matter in dispute only when (1) that issue is identical to an issue decided in an earlier proceeding; (2) the issue was actually litigated on the

33

merits; (3) the issue was decided in the earlier proceeding, meaning the prior determination of the issue must have been a critical and necessary part of the judgment in that earlier decision; and (4) the burden of proof in the earlier proceeding is at least as stringent as the burden of proof in the current proceeding." Bates v. Harvey, 518 F.3d 1233, 1240-41 (11th Cir. 2008) (quotations and internal citations omitted). "[C]ollateral estoppel can apply only 'when the parties are the same (or in privity) [and] if the party against whom the issue was decided had a full and fair opportunity to litigate the issue in the earlier proceeding.'" EEOC v. Pemco Aeroplex, Inc., 383 F.3d 1280, 1285 (11th Cir. 2004) (quoting In re Southeast Banking Corp., 69 F.3d 1539, 1552 (11th Cir.1995)). "The party seeking to invoke collateral estoppel bears the burden of proving that the necessary elements have been satisfied." In re McHorter, 887 F.2d 1564, 1566 (11th Cir. 1989).

The Court finds that Plaintiff has not met his burden of proof that issue preclusion applies. Plaintiff has not identified the elements needed for issue preclusion and he has not explained why each element is met. Furthermore, although he claims that "due to its high level of involvement and direction at every single level, [the Government] controlled the Arbitration for purposes of issue preclusion," Plaintiff provides no additional supporting facts or reasoning showing that the Government was in privity with Great American during

arbitration[12]. (Doc. 11, at 25.) Thus, Plaintiff has failed to establish that the Government was in privity with Great American for purposes of issue preclusion, and, for this reason alone, his argument must fail. Pemco Aeroplex, Inc., 383 F.3d at 1285 ("If identity or privity of parties cannot be established, then there is no need to examine the other factors in determining whether res judicata or collateral estoppel applies."). Accordingly, the Court **AFFIRMS** the ALJ's decision that issue preclusion did not bar the Government from pursing the present action.

### III. CONCLUSION

The Court **DENIES IN PART** and **GRANTS IN PART** the parties' cross motions for summary judgment. (Docs. 9, 15.) The Court finds that the ALJ's decision regarding Plaintiff's 2009 crop insurance claim was arbitrary and capricious, thus it **VACATES** that portion of the ALJ's decision. The Court finds that the ALJ's decision regarding Plaintiff's failure to report his carryover tobacco was not arbitrary and capricious, thus it **AFFIRMS** that portion of the ALJ's decision. Finally, the Court **AFFIRMS** the ALJ's finding that issue preclusion does not apply.

---

[12] The Court acknowledges that Plaintiff did reference his motion and brief filed before the ALJ as providing further argumentation. The Court, however, will not consider any arguments incorporated by reference because such arguments are nothing more than attempts to exceed the page limits set forth in this Court's local rules. See FNB Bank v. Park Nat. Corp, No. 13-0064-WS-C, 2013 WL 6842778, *1 n.1 (S.D. Ala. Dec. 27, 2017).

The Court, however, notes that its split finding might have implications for the sanctions that may be imposed by the ALJ in this case. See 7 C.F.R. section 400.454(a)(4) ("Disqualification and civil fines may be imposed regardless of whether FCIC or the approved insurance provider has suffered any monetary loss. However, if there is no monetary loss, disqualification will only be imposed if the violation is material in accordance with section 400.454(c)."). Accordingly, the Court **REMANDS** this case back to the ALJ for purposes of determining the appropriate sanctions in light of this Court's ruling. See Black Warrior Riverkeeper, Inc. v. United States Army Corps of Engineers, 781 F.3d 1271, 1290-91 (11th Cir. 2015) (finding that "remedy of remand without vacatur is within a reviewing court's equity powers under the APA"). This Court's injunction pursuant to 5 U.S.C. § 705 **SHALL REMAIN IN PLACE** until the ALJ determines the appropriate sanctions on remand.

**ORDER ENTERED** at Augusta, Georgia, this _6th_ day of September, 2018.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA